UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

NAFEEHA MAJEED,              )  Case No. 1:16CV2519
                                     )
          Plaintiff,             )
                                       )  JUDGE SOLOMON OLIVER
          v.                     )  MAGISTRATE JUDGE DAVID A. RUIZ
                                       )
COMMISSIONER OF SOCIAL       )
      SECURITY,              )
                                       )
          Defendant.         )  <u>REPORT AND RECOMMENDATION</u>

Plaintiff Nafeeha Habeeba Majeed ("Majeed" or "claimant") challenges the final decision of Defendant Commissioner of Social Security ("Commissioner"), denying her applications for a period of disability ("POD"), disability insurance benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.

The issue before the court is whether the final decision of the Commissioner is supported by substantial evidence and, therefore, conclusive. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be affirmed.

## I.    PROCEDURAL HISTORY

On December 16, 2013, Majeed protectively filed applications for a POD, DIB, and SSI benefits, alleging disability beginning September 30, 2008. (R. 9, PageID #: 240-246, 247-252,

278-289, 70.)  Majeed listed her physical or mental conditions that limit her ability to work as: "heart problems, anxiety, depression."  (R. 9, PageID #: 283.)  Majeed's application was denied initially and upon reconsideration.  (R. 9, PageID #: 128-157, 158-187.)  Thereafter, Majeed filed a written request for a hearing before an administrative law judge.  (R. 9, PageID #: 89-90.)

An Administrative Law Judge ("the ALJ") held a hearing on August 10, 2015.  (R. 9, PageID #: 91-127.)  Majeed appeared at the hearing, was represented by counsel, and testified. (*Id.* at 98-117.)  A vocational expert ("VE") also attended the hearing and provided testimony. (*Id.* at 93, 117-125.)  On September 14, 2015, the ALJ issued his decision, applying the standard five-step sequential analysis to determine whether Majeed was disabled.  (R. 9, PageID #: 70-80; *see generally* 20 C.F.R. §§ 404.1520(a), 416.920(a).)  Based on his review, the ALJ concluded Majeed was not disabled.  (R. 9, PageID #: 71, 80.)

The Appeals Council denied Majeed's request for review, thus rendering the ALJ's decision the final decision of the Commissioner.  (R. 9, PageID #: 58-60.)  Majeed now seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  The parties have completed briefing in this case.  Majeed's brief frames the following legal issues for the court's review, although as explained below she presents additional arguments for the court to consider:

> [1] Whether the finding of the ALJ lacks substantial evidence as it failed to fully and fairly evaluate the medical record involving Plaintiff's emotional impairment.
>
> [2]  Whether the ALJ failed to provide good reason and to properly evaluate opinion evidence from the consultative examiner and treating therapist.

(R. 10, PageID #: 1126.)

## II.    PERSONAL BACKGROUND INFORMATION

Majeed was born on January 10, 1969, and was 39 years old on the alleged disability onset date.  (R. 9, PageID #: 278, 240, 79.)  Accordingly, Majeed was considered a "younger person" for Social Security purposes.  *See* 20 C.F.R. § 416.963.  Majeed has a high school education (GED), and is able to communicate in English.  (R. 9, PageID #: 282, 284, 79.) Majeed had past relevant work as an industrial order clerk or telemarketer, and as a front office clerk.  (R. 9, PageID #: 79, 119, 284.)

## III.    RELEVANT MEDICAL EVIDENCE[1]

Disputed issues will be discussed as they arise in Majeed's brief alleging error by the ALJ.  As noted earlier, Majeed applied for disability benefits on December 16, 2013.  (R. 9, PageID #: 70.)  Majeed listed her physical or mental conditions that limit her ability to work as: "heart problems, anxiety, depression."  (R. 9, PageID #: 283.)

Majeed was admitted to Fairview Hospital on September 15, 2011, with chest pain and pressure symptoms.  (R. 9, PageID #: 539.)  She was found to have high blood pressure (223/144) with high troponins suggestive of a non-ST elevation myocardial infarction.  *Id.* at 542.  She was scheduled to have a cardiac catheterization the next morning.  *Id.*  EKG was abnormal, with consideration for left ventricular hypertrophy and ischemia.  *Id.* at 592.  The

---

[1]  The summary of relevant medical evidence is not intended to be exhaustive.  It includes only those portions of the record cited by the parties and also deemed relevant by the court to the assignments of error raised.

postoperative diagnosis was total occlusion of the right coronary artery, which was stented at the same time.  *Id.* at 593.

Less than a month later, on October 13, 2011, Majeed returned to Fairview Hospital complaining of chest pain, shortness of breath, and numbness in her neck and left arm.  (R. 9, PageID #: 609.)  An EKG showed inferior wall ischemia.  *Id.* at 655.  Another catheterization and stenting was performed, this time for a 60% occlusion of the proximal portion of the right coronary artery.  *Id.* at 674-675.  The final diagnosis was coronary atherosclerosis, acute myocardial infarction, unstable angina, and abnormal EKG.  *Id.* at 649.

Majeed had continuing palpitations, dizziness, and shortness of breath, and in November 2011 was referred to a cardiologist.  (R.9, PageID #: 343, 345.)  On November 18, 2011, Majeed presented to cardiologist David Schnell, M.D.  *Id.* at 320-323.  An ECG showed inferior infarct, and the impression of Dr. Schnell was palpitations, coronary artery disease, and hypertension. *Id.* at 322.  Her medications were continued, including Nitrostat for the angina.  *Id.* at 323. Majeed's palpitations, racing heart, dizziness, and shortness of breath were a recurring issue. *See, e.g.*, PageID #: 328, 692, 728, 445, 1030.

Majeed presented to Christina Stehouwer, P.A., at Care Alliance on April 4, 2013, for depression and refills of her prescriptions.  (R. 9, PageID #: 389.)  Majeed reported that she had episodes of depression throughout her life, beginning in her early twenties.  *Id.*  She was also very troubled by her weight gain; her weight had increased from 172 pounds in September 2011 to 198 pounds at the current appointment.  *Id.*  Stehouwer prescribed Effexor for her depression. *Id.* at 390.

4

At a follow-up appointment with Stehouwer on October 31, 2013, Majeed reported that she had run out of her medications five days previously, but was feeling well on the medications, with no side effects or problems. (R. 9, PageID #: 387.) She denied experiencing chest pain, shortness of breath, or palpitations. *Id.* However, Majeed reported that she was severely depressed, with no energy or motivation. She reported crying all the time, that she does not get out of bed most days, and she does not bathe. *Id.* Majeed said she initially had some improvement with Effexor, but it stopped working. *Id.* Stehouwer increased the dosage on the Effexor, and referred Majeed for a mental health assessment and evaluation. (R. 9, PageID #: 388.)

Majeed was seen by Meagan Ray-Novak, LISW, on June 3, 2014, for a psychological evaluation. (R. 9, PageID #: 971-976.) Majeed reported severe anxiety, depressed mood, anhedonia, and sleep difficulties. *Id.* at 971. She also reported difficulty concentrating or remembering, but did not report mood swings. *Id.* The treatment plan advised Majeed to continue with weekly counseling sessions to address anxiety, depression symptoms, and to build coping skills. *Id.* at 974. Ray-Novak diagnosed Majeed with major depressive disorder, generalized anxiety disorder, and depression. *Id.* at 975.

During an August 4, 2014 counseling appointment with Ray-Novak, Majeed reported that she was "not good at all." (R. 9, PageID #: 965.) Her food stamps had been cut completely, and her four-year-old grandson was diagnosed with cancer. She had been experiencing sleep difficulties, increased anxiety, tearfulness, and depressed mood. *Id.*

On December 18, 2014, Majeed reported to Ray-Novak that she had been "pretty good" since their last session. (R. 9, PageID #: 959.) Although her mood was still up-and-down, it was

5

not as severe during the fluctuations.  *Id.*  A move into alternate housing greatly improved her mood, and she reported improved sleep as well as decreased irritability.  *Id.*

At a gynecological exam with physician's assistant Stehouwer on May 6, 2015, Majeed reported that she was feeling more depressed again; she had been taking Paxil but felt like it was "wearing off."  (R. 9, PageID #: 1112.)  She reported crying and sleeping all the time.  *Id.* Majeed said that she would like to resume visits with Ray-Novak who she had last seen in December 2014.  *Id.*

As to opinion evidence, Majeed had a psychological evaluation with state consultant, Mitchell Wax, Ph.D., on February 25, 2014.  (R. 9, PageID #: 495-500.)  The evaluation was conducted through a clinical interview; no psychological testing was conducted.  *Id.* at 495, 498. Dr. Wax noted that Majeed's "chief complaint about why she is not able to work is, 'I can't stay focused, and sometimes I have trouble getting up and out of bed in the morning.'"  *Id.* at 495. She reported that she was taking Effexor, an anti-depressant and anti-anxiety medication.  *Id.* at 496.

Majeed reported interrupted sleep, said she cooks three to four times a week, cleans her dishes, does the laundry, cleans her house regularly, and she appeared neat and clean, bathing two to three times a week.  (R. 9, PageID #: 497.)  She spends most of her day watching television, although she reported she enjoys reading.  *Id.*  Twice a week she leaves the house to go shopping, but her daughters and grandchildren visit about every other week.  *Id.*

Dr. Wax noted that Majeed's speech was logical, coherent, and goal-oriented, although she became more anxious and tense as the interview progressed.  (R. 9, PageID #: 497.)  Majeed described her usual mood as anxious and depressed, with frequent crying spells.  *Id.* at 498.  She

6

also described having panic attacks every two or three months, and she has problems with agoraphobia ("I don't like being around people.")  *Id.*  Dr. Wax stated that Majeed appeared to be functioning in the average range of intelligence, that she was oriented to person, place, time and situation, and that her ability to concentrate was good.  *Id.*  Dr. Wax diagnosed Majeed with panic disorder, with agoraphobia, and major depression.  (R. 9, PageID #: 498.)  He concluded that Majeed was a shut-in with little contact with others, who is able to live on her own, doing her own shopping, for the most part, and household chores.  *Id.* at 499.

Dr. Wax's functional assessment was that Majeed is able to understand, remember and carry out instructions, and that her estimated IQ is in the average range of intelligence.  (R. 9, PageID #: 499.)  Dr. Wax assessed that Majeed is able to maintain attention and concentration to work at a job.  *Id.*  She is persistent and completes the tasks she sets out to do.  She is able to perform both simple and multi-level tasks.  *Id.*  Dr. Wax opined that Majeed would have difficulty responding appropriately to supervisors and coworkers due to her depression and panic attacks.  *Id.*  He noted Majeed would not respond appropriately to work pressures in a work setting due to her panic disorder and depression.  *Id.*

On August 7, 2015, Ray-Novak completed a mental health source statement form for Majeed.  (R. 9, PageID #: 1117-1122.)  Ray-Novak reported the treatment relationship lasted for about six months, with weekly to bi-weekly visits from June 2014 through December 2014.  *Id.* at 1117.  She confirmed her diagnosis of Majeed as generalized anxiety disorder, and major depressive disorder, moderate.  *Id.*  Ray-Novak stated that Majeed was treated with medication (Paxil) and individual counseling sessions, and that her response was positive to both.  *Id.*  Ray-Novak described her clinical findings:  "Ms. Majeed exhibits significant anxiety and depressive

7

symptoms that have negatively impacted her during our work together."  *Id.*  Her prognosis was

that Majeed "has been doing well but still struggles considerably in her daily life."  *Id.*

On the form, Ray-Novak checked off various symptoms, including anhedonia, decreased

energy, persistent anxiety and mood disturbance, emotional lability, difficulty thinking or

concentrating, disturbed sleep, and paranoid thinking and irrational fears.  (R. 9, PageID #:

1118.)  Ray-Novak assessed that Majeed would be unable to complete a normal workday or

workweek without interruptions from her psychologically based symptoms.  *Id.*  Also, she was

seriously limited in her ability to remember work procedures, to maintain attention for two hours,

to maintain regular attendance and punctuality, to work with others without becoming distracted,

to perform at a consistent pace without an unreasonable number of rest periods, and to deal with

normal work stress.  *Id.*

## IV.    ALJ's DECISION

The ALJ made the following findings of fact and conclusions of law in his September 14,

2015, decision:

> 1.  The claimant meets the insured status requirements of the Social Security Act
> through March 31, 2016.
>
> 2.  The claimant has not engaged in substantial gainful activity since September
> 30, 2008, the alleged onset date (20 C.F.R. 404.1571 *et seq.* and 416.971 *et seq.*).
>
> 3.  The claimant has the following severe impairments:  coronary artery disease,
> status-post left heart catheterization and stenting; depression; anxiety; obesity;
> and hypertension (20 C.F.R. 404.1520(c) and 416.920(c)).
>
> 4.  The claimant does not have an impairment or combination of impairments that
> meets or medically equals the severity of one of the listed impairments in 20
> C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525,
> 404.1526, 416.920(d), 416.925, and 416.926).

8

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she is limited to occasionally climbing ramps and stairs; never climbing of ladders and scaffolds; occasionally balancing, stooping, kneeling, crouching and crawling; no work with unprotected heights, moving mechanical parts, or that requires operating a motor vehicle; no environments that require more than frequent exposure to extreme cold or heat; limited to performing simple, routine, and repetitive tasks but not at a production rate pace (e.g. no assembly line work); limited to simple work-related decisions in using her judgment; only occasional interaction with supervisors and coworkers, but no interaction with the public; and limited to simple work-related decisions in dealing with changes in the work setting.

6.  The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965).

7.  The claimant was born on January 10, 1969, and was 39 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (see SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from September 30, 2008, through the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g)).

(R. 9, PageID #: 72-73, 75, 79-80.)

## V.    DISABILITY STANDARD

A claimant is entitled to receive DIB or SSI benefits only when she establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. §§ 404.1505(a), 416.905(a).

Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability."  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001).  The Sixth Circuit has outlined the five steps as follows:

> First, the claimant must demonstrate that he has not engaged in substantial gainful activity during the period of disability.  20 C.F.R. § 404.1520(a)(4)(i). Second, the claimant must show that he suffers from a severe medically determinable physical or mental impairment.  *Id.* § 404.1520(a)(4)(ii).  Third, if the claimant shows that his impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, he is deemed disabled.  *Id.* § 404.1520(a)(4)(iii). Fourth, the ALJ determines whether, based on the claimant's residual functional capacity, the claimant can perform his past relevant work, in which case the claimant is not disabled.  *Id.* § 404.1520(a)(4)(iv).  Fifth, the ALJ determines whether, based on the claimant's residual functional capacity, as well as his age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled.  *Id.* § 404.1520(a)(4)(v).
>
> The claimant bears the burden of proof during the first four steps, but the burden shifts to the Commissioner at step five. *Walters v. Commissioner of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

*Wilson v. Commissioner of Social Security*, 378 F.3d 541, 548 (6th Cir. 2004); *see also* 20 C.F.R. § 416.920(a)(4).

10

## VI.    STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether the ALJ applied the correct legal standards, and whether the findings of the ALJ are supported by substantial evidence. *Blakley v. Commissioner of Social Security*, 581 F.3d 399, 405 (6th Cir. 2009)*; Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence, but less than a preponderance of the evidence. *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003); *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Wright*, 321 F.3d at 614; *Kirk*, 667 F.2d at 535.

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this court would resolve the issues of fact in dispute differently, or substantial evidence also supports the opposite conclusion. *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). This court may not try the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *Wright*, 321 F.3d at 614; *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). The court, however, may examine all the evidence in the record, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989); *Hubbard v. Commissioner*, No. 11-11140, 2012 WL 883612, at *5 (E.D. Mich Feb. 27, 2012) (quoting *Heston*, 245 F.3d at 535).

11

VII.    ANALYSIS

A.  Legal Issues

Majeed's brief identifies the following legal issues for the court's review, but she raises

additional issues that the court considers below:

[1]  Whether the finding of the ALJ lacks substantial evidence as it failed to fully
and fairly evaluate the medical record involving Plaintiff's emotional impairment.

[2]  Whether the ALJ failed to provide good reason and to properly evaluate
opinion evidence from the consultative examiner and treating therapist.

(R. 10, PageID #: 1126.)

B.  Analysis of the Evidence

Majeed's initial claim frames a challenge to the ALJ's decision evaluating the medical

record and Plaintiff's emotional impairment.  (R. 10, PageID #: 1126.)  However, Majeed's brief

presents broader argument challenging the ALJ's evaluation of her "continuing and consistent

complaints of palpitations, chest pain, shortness of breath and/or dizziness related to her

coronary condition and hypertension."  *Id.* at 1135.  The court, therefore, addresses Majeed's

entire argument relating to the physical and emotional conditions raised in her brief.

The ALJ has the responsibility for reviewing all the evidence in making his

determinations.  20 C.F.R. § 416.927(e)(2).  The Sixth Circuit has made clear that an ALJ has a

duty to consider the record as a whole. *See Hurst v. Secretary of Health and Human Servs.*, 753

*F.2d 517, 519 (6th Cir. 1985)* (failing to consider the record as a whole undermines the ALJ's

decision).  An ALJ cannot simply "pick and choose" evidence in the record, "relying on some

and ignoring others, without offering some rationale for his decision." *Young v. Commissioner of*

*Social Security*, 351 F. Supp. 2d 644, 649 (E.D. Mich. 2004).  The ALJ evaluates every medical

12

opinion received in evidence, and considers statements provided by medical sources, whether or not based on formal medical examinations.  20 C.F.R. § 416.927(c); 20 C.F.R. § 416.945(a)(3).  Although the ALJ reviews and considers all the evidence before him, the responsibility for assessing the claimant's residual functional capacity rests with the ALJ.  20 C.F.R. § 416.946(c).

### 1.  Majeed's Coronary Condition

Majeed contends that the ALJ failed to evaluate the entire record, instead "picking and choosing" from a very limited portion of the record.  (R. 10, PageID #: 1134-1135.)  Majeed stresses that "the ALJ must consider all evidence in the record when making a decision, including all objective medical evidence, medical signs, and laboratory findings."  Id. at 1135, citing 20 C.F.R. §§ 404.1520(a)(3), 404.1512(b), 404.1513.  The ALJ's decision, Majeed argues, ignored records favorable to her.  Id.

Majeed calls into question the following portion of the ALJ's decision: [2]

Regarding the claimant's physical health, the objective medical evidence also does not support the claimant's assertion regarding the nature and severity of her subjective symptoms and functional limitations.  Specifically, treatment records indicate no physical health concerns in September 2014 and December 2014 (12F/2, 5). Despite the claimant's allegations regarding physical pain and limitations, she indicated in July 2014 that she loves swimming and was going periodically to the community pool (12F/24).  Numerous objective tests in the record also indicate normal or unremarkable results, including a recent chest x-ray showing no acute cardiopulmonary pathology, and an EKG showing normal sinus rhythm and no acute ischemic changes (14F/16).  The undersigned finds that all of these factors negatively impact the subjective nature of the claimant's complaints of disabling symptoms.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the

---

[2] See R. 10, PageID #: 1135, citing PageID #: 76 ("Tr. 19").

intensity, persistence and limiting effects of these symptoms are not entirely
credible for the reasons explained in this decision.

(R. 9, PageID #: 76-77.)

Majeed asserts that she presented consistent complaints of palpitations, chest pain,

shortness of breath, and dizziness related to her coronary condition and hypertension, but

contends the ALJ failed to discuss the evidence concerning these conditions.  (R. 10, PageID #:

1135.)  Instead, she contends, the ALJ provided a vague reference to "numerous objective tests"

that were allegedly normal or unremarkable, including a recent chest x-ray which showed no

acute cardiopulmonary pathology.  *Id.*, citing R. 9, PageID #: 76.  Majeed characterizes the

ALJ's statement as conclusory and unsupported by the record.  *Id.*  Seeking to counter the ALJ's

conclusions, Majeed contends that EKG results from September and October 2011 were

abnormal.  (R. 10, PageID #: 1135-1136).

The record indeed shows abnormal EKG results in September and October 2011.  (R. 9,

PageID #: 592, 655, 649.)  As the ALJ recognized, Majeed's history included two cardiology

procedures with stent placement.  (R. 9, PageID #: 77, *see also* PageID #: 593, 674-675.)  The

ALJ included that treatment history in his decision, and also reasonably focused on more recent

evaluations.

The ALJ noted "the objective medical evidence also does not support the claimant's

assertion regarding the nature and severity of her subjective symptoms and functional

limitations."  (R. 9, PageID #: 76.)  For example, the ALJ concluded treatment records from

September and December 2014 indicated no physical health concerns.  (R. 9, PageID #: 76,

citing PageID #: 962, 959.)  There, he referred to Majeed's September 24, 2014, and December

18, 2014, appointments with therapist Ray-Novak, during which Majeed "denie[d] current

14

physical health concerns."  (R. 9, PageID #: 962, 959.)  The decision also noted that despite

Majeed's allegations regarding physical pain and limitations, she stated in July 2014, that she

loved swimming and was going periodically to the community pool.  (R. 9, PageID #: 76, citing

PageID #: 981.)  Here, the ALJ was citing a July 3, 2014 appointment with physician's assistant

Stehouwer, which also indicates Majeed denied chest pain, shortness of breath, or palpitations;

and Stehouwer noted no dizziness, myalgia or muscle cramps.  (R. 9, PageID #: 981.)

     Moreover, the ALJ's decision referenced objective tests in the record, relying upon "a

recent [October 2014] chest x-ray showing no acute cardiopulmonary pathology, and an

[October 2014] EKG showing normal sinus rhythm and no acute ischemic changes."  (R. 9,

PageID #: 76, citing PageID #: 1045.)  Majeed counters that there are no objective tests with

similar results, claiming that an April 2014 echocardiogram "performed only months before the

October [2014] EKG" supports her argument.[3]  (R. 10, PageID #: 1135, 1136, citing R. 9,

PageID #: 855-856.)  Contrary to Majeed's contention, cardiologist, Dr. Azmat Hussain,

reviewed April and October test results and his characterization of the April 2014 test results

(cited by Majeed) is almost identical to his characterization of the October 2014 test results.

(R.9, PageID #: 508, 1045.)  On April 18, 2014, Majeed presented to the Fairview Hospital

emergency room complaining of shortness of breath.  (R. 9, PageID #: 507.)  Although the EKG

---

[3] Majeed also suggests that there were "numerous objective tests" similar to the fall 2011 test
results when she had her cardiac procedures, but her brief cites only to the April 2014 test
discussed above.  (R. 10, PageID #: 1136).  The Commissioner argues that Majeed has waived
this entire argument, because she "fails to cite any records that the ALJ overlooked."  (R. 12,
PageID #: 1154.)  The court does not consider the argument waived, because Majeed does refer
to one, the " [April 2014] echocardiogram performed only months before the October [2014]
EKG."  (R. 10, PageID #: 1136, citing PageID #: 855-856 ("Tr. 798-799"); *see also* PageID #:
507-508.)

results did show, as Majeed points out, a dilated inferior vena cava in the right atrium (R. 9,

PageID #: 855-856), cardiologist, Dr. Hussain, characterized the test as:  "EKG reviewed which

shows normal sinus rhythm . . . chest x-ray negative."  (R. 9, PageID #: 508.)  As to the later

October test results, cited by the ALJ, Majeed was admitted on October 17, 2014, with non-

exertional chest pain and on and off palpitations.  (R. 9, PageID #: 1045.)  Dr. Hussain concluded

the chest x-ray was negative for any acute cardiopulmonary pathology, and further stated "EKG

reviewed which shows normal sinus rhythm.  No acute ischemic changes."  *Id.* Dr. Hussain

discharged Majeed that same day.  *Id.* at 1046.  Although Majeed contends that the ALJ's

decision ignored test results favorable to her, the ALJ cited to each of the instances discussed

above.  (R. 9, PageID #: 76-77, citing PageID #: 1045-1046 ("14F/16-17"), and 507-508 ("7F/7-

9").)

Further the ALJ confirmed the "medical records establish significantly limiting

symptoms of shortness of breath and chest pain associated with the claimant's coronary artery

disease[,]" which required catheterization and placement of stents in the fall of 2011 (R. 9,

PageID #: 73).  In making the above finding, the ALJ gave little weight to the opinion of a state

agency doctor who determined that Majeed's coronary artery disease was non-severe. (R. 9,

PageID #: 73.)  That finding runs contrary to Majeed's overall contention that the ALJ failed to

recognize evidence of her consistent complaints of palpitations, chest pain, and shortness of

breath related to her coronary condition (R. 10, PageID #: 1135).  In addition, the ALJ discussed

Majeed's complaints of fatigue, shortness of breath, and chest pain, but noted that Majeed's

more recent treatment consisted of conservative measures such as medication and exercise

counseling.  *Id.* at 77.  The ALJ identified coronary artery disease as a severe impairment (R. 9,

16

PageID #: 73), but found that Majeed's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible.  *Id.* at 77.  After considering the record evidence, the ALJ concluded that the record indicated that Majeed remains capable of light work with postural limitations.  *Id.*

As the record discussed above demonstrates, the ALJ's decision concerning the limiting effects of Majeed's symptoms of coronary artery disease is supported by substantial evidence. Although Majeed characterizes the ALJ's decision as cherry-picking from the evidence, the court finds it reasonably "can be described more neutrally as weighing the evidence."  *See, e.g.*, *White v. Commissioner*, 572 F.3d 272, 284 (6th Cir. 2009).

### 2.  Majeed's Emotional Impairments

Majeed contends that the ALJ ignored a substantial portion of the medical record in addressing her emotional impairments, and "instead considered but a few counseling notes where she showed some improvement."  (R. 10, PageID #: 1137.)  Majeed argues that it is in the nature of her emotional impairments to have a waxing and waning course, which is why a longitudinal view of the record is required.  *Id.*  Majeed states that she consistently reported being depressed, having severe anxiety, having no energy, crying all the time, and often not getting out of bed.  *Id.* She contends that the ALJ's reliance on two counseling records when she showed improvement "was not an accurate portrayal of the medical evidence or the degree of functioning she maintained."  *Id.*

As an initial matter the ALJ noted "that the record reflects significant gaps in the claimant's history of treatment."  (R. 9, PageID #: 76.)  For example, the ALJ noted that Majeed had received therapy for only six months, from June 2014 to December 2014, before she ended

treatment.  (*Id*.)  Although Majeed contends the ALJ relied on "only two counseling visits" in evaluating her emotional impairments (R. 10, PageID #: 1137), the decision states that he considered the record as a whole (R. 9, PageID #: 77).  A review of the ALJ's discussion of the evidence he considered in reaching his RFC finding supports this assertion.  (R. 9, PageID #: 76.)

The ALJ noted the record established Majeed's anxiety and depression.  (R. 9, PageID #: 77, citing R. 9, PageID #: 498-499 (Dr. Wax's report).)  But the ALJ determined the "treatment records indicate that therapy and medication has been generally effective in improving the claimant's mental impairments."  (R. 9, PageID #: 77.)  Although Majeed had complained of depressed mood, anhedonia, difficulty sleeping, and lack of energy in June 2014, the ALJ pointed out that by that December she reported doing "pretty well," despite a fluctuating mood, and reported improved sleep and interactions with her children, as well as decreased irritability. *Id.* (citing R. 9, PageID #: 971, 959.)  She ended treatment in December 2014, which the ALJ found suggested her mental impairments were not as severe as she alleged.  (R. 9, PageID #: 76, citing PageID #: 1117.)  Although Majeed indicated her preferred provider was no longer available, the ALJ found that she did not attempt to re-establish care until May 2015.

The ALJ noted that at a May 2015, appointment, Majeed felt like her medications were "wearing off," but she resumed counseling, which had previously been successful in reducing her symptoms.  *Id.* (citing R. 9, PageID #: 1112.)  Viewing the evidence as a whole, the ALJ concluded the record indicates that, despite her mental impairments, Majeed remained capable of simple, unskilled work that is not fast-paced and requires only limited social interaction.  *Id.*

In addition, the ALJ discussed inconsistencies in her testimony and the record.  For example, Majeed stated that her medications and treatment were not helping.  The ALJ pointed

out that Majeed had reported during a September 2014 therapy appointment that she had been

doing "much better" and felt normal for the first time since she was 18.  (R. 9, PageID #: 76,

citing PageID #: 962.)  She also told the therapist that she was considering returning to work

(part-time), which the ALJ determined indicated "that, at least for some time during the period at

issue, the claimant believed she was capable of working."  *Id.*  Ray-Novak reported in August

2015, that Majeed had been treated with medication and individual counseling sessions, and that

her response was positive to both.  (R. 9, PageID #: 1117.)  The ALJ's decision concerning the

evidence of the limiting effects of Majeed's emotional impairments is supported by substantial

evidence.

### 3.  Paragraph "B" Criteria

Majeed challenges the ALJ's ruling that she did not meet the paragraph B criteria.  (R.

10, PageID #: 1137.)  She refers to the Third Step of the 5-Step analysis, where the claimant

must show that her impairment meets or medically equals one of the impairments listed in 20

C.F.R. Pt. 404, Subpt. P, App. 1.  *Wilson*, 378 F.3d at 548; 20 C.F.R. § 416.920(a)(4).  To meet

Listing 12.04, the claimant must show she has a qualifying affective disorder, and suffers from at

least two of the following: 1) marked restrictions of activities of daily living; 2) marked

difficulties in maintaining social functioning; 3) marked difficulties in maintaining

concentration, persistence or pace; or 4) repeated episodes of decompensation, each of extended

duration (collectively referred to as the "paragraph B criteria").  20 C.F.R. Pt. 404, Subpt. P,

App.1, Listing 12.04.

19

The ALJ's found that she had only moderate difficulties in social functioning; activities of daily living; and concentration, persistence or pace, which Majeed argues is not an accurate evaluation of her abilities.  (R. 10, PageID #: 1137-1139.)  The decision relied on record evidence that stated Majeed lives alone and performs most of the household chores, makes her own meals, and shops for groceries.  (R. 9, PageID #: 74, citing PageID #: 497.)  During her psychological evaluation with Dr. Wax, Majeed reported that she cooks three to four times a week, washes her dishes after she uses them, does laundry twice a month, cleans her house regularly, and goes to the corner store to go grocery shopping twice a week.  (R. 9, PageID #: 497, 499.)  The ALJ may properly rely on such record evidence in his determination that Majeed is not markedly limited in her daily activities.

Majeed contends that the ALJ's finding that she has moderate limitations in activities of daily living is inaccurate, for example, questioning the ALJ's determinations that she performs most of her household chores, makes her own meals and shops for groceries.  (R. 10, PageID #: 1137-1138, citing R. 9, PageID #:74).  Majeed claims that "she only went grocery shopping with her daughter and that at other  times she simply gives her daughter a shopping list and does not go herself," referring to her testimony at the hearing.  *Id.* at 1138, citing R. 9, PageID #: 100, 115.  The hearing testimony arose in the context of the ALJ's question— inquiring, "How do you get around?"— after Majeed testified that she had no car.  (R. 9, PageID #: 100.)  In response to his inquiry as to whether she took a bus or the Rapid[4] Transit (train), Majeed responded that she either took a bus or got a ride from somebody.  *Id.* at 100-101.  Following further inquiry about

---

[4]  The court reporter transcribed the colloquial reference to the "Rapid," as the "Rabbit."  (R. 9, PageID #: 100.)

how she goes to the grocery store, whether by bus or driven by another, Majeed stated she got a ride to the grocery store from her daughter and son-in-law once or twice a month.  *Id.*  Majeed's report to Dr. Wax that she goes to the corner store to go grocery shopping twice a week is reasonable and does not necessarily conflict with her hearing testimony on the topic of motorized transport.  (R. 9, PageID #: 497.)  She has no limitation, as to walking, in the record that would render her unable to walk to the corner herself.  (R. 9, PageID #: 110-111, 165, 175, 981.)  For example, she testified that she can easily walk a couple of blocks.  (R. 9, PageID #: 110-111.)

Majeed's brief contends that she is able to perform many of her activities of daily living only with the assistance of her daughters.  (R. 10, PageID #: 1138.)  The evidence does not support this assertion.  Dr. Wax's concluded that she is able to live on her own and take care of herself.  (R. 9, PageID #: 499.)  Majeed testified that she occasionally gets a ride from her daughter, but she did not testify that she could not drive, rather she testified that "I don't have a car right now."  (R. 9, PageID #: 100.)  Her brief states that she "only occasionally bathes and cleans her home."  (R. 10, PageID #: 1138.)  She did not testify that she needed any assistance bathing and she reported to Dr. Wax that "she cleans her house regularly, sweeping three to four [times] a week and cleaning the bathroom weekly."  (R. 9, PageID #: 497.)

Majeed also argues that the ALJ's assessment of moderate difficulties in social functioning is flawed.  (R. 10, PageID #: 1138.)  Simply having the ability to communicate with her own family on an occasional basis, she contends is not good reason for the "moderate" finding made by the ALJ.  *Id.*  Rather, she claims the evidence supports a finding of "marked" limitation in social functioning, primarily relying upon a social isolation theory.  However, there is no evidence of other behaviors that might lead to a finding of more than a moderate limitation.

For example, there is no evidence of highly antagonistic, uncooperative or hostile behavior, nor is there any evidence of altercations, evictions or firings based on antisocial behavior.  *See, e.g.,* 20 C.F.R. Pt. 404, Subpt. P, App.1, Listing 12.00.C.2.

The ALJ provided substantial evidence to support his finding of moderate difficulties in social functioning.  The ALJ specifically mentioned that Majeed visits with her four grandchildren once or twice a month, and watches them play outside or watches TV with them.  (R. 9, PageID #: 74.)  Although she does not feel comfortable in stores, and her daughters sometimes shop for her (*Id.* at 74), she nevertheless is able to do her own grocery shopping about twice a week (*id.* at 74, citing 497).  Also, Majeed reported that she goes to the community pool periodically, despite that it is sometimes very crowded.  (R. 9, PageID #: 76, citing PageID #: 981.)

Majeed argues as well that the ALJ's assessment of moderate difficulties in concentration, persistence or pace is in error.  (R. 10, PageID #: 1138-1139.)  Majeed notes that Dr. Wax opined that she would not respond appropriately to work pressures in a work setting.  *Id.* at 1139, citing R. 9, PageID #: 499.  However, as the Commissioner points out, Dr. Wax also found that Majeed was able maintain attention and concentration to work at a job.  (R. 12, PageID #: 1161-1162.)  Dr. Wax stated, "She stated she is able to concentrate to read books.  She is persistent and does complete tasks she sets out to do. She is able to perform simple tasks and perform multi-step tasks..."  (R. 9, PageID #: 499.)  The Commissioner also notes that the state agency reviewing psychologists found only mild difficulties in maintaining concentration, persistence or pace.  (R. 12, PageID #: 1162, citing R. 9, PageID #: 127, 151, 163, 177.)

The Commissioner responds to these various arguments noting that, as long as substantial evidence supports the ALJ's decision, the decision must stand even if the evidence could support an opposite conclusion.  (R. 12, PageID #: 1161, citing *Warner v. Commissioner*, 375 F.3d 387, 390 (6th Cir. 2004); and *Her v. Commissioner*, 203 F.3d 388, 389-390 (6th Cir. 1999).)  As noted earlier, the Commissioner's determination must stand if supported by substantial evidence, regardless of whether this court would resolve the issues of fact in dispute differently, or substantial evidence also supports the opposite conclusion.  *Bass*, 499 F.3d at 509; *Mullen*, 800 F.2d at 545.  The ALJ's decision concerning the Paragraph "B" criteria is supported by substantial evidence.


C.  Opinion Evidence

An ALJ is required to evaluate all medical opinions, regardless of source, unless the opinion is from a treating source and entitled to controlling weight.  *Walton v. Commissioner*, 187 F.3d 639; 1999 WL 506979, at *2 (6th Cir. 1999) (TABLE, text in WESTLAW) (per curiam); 20 C.F.R. §§ 404.1527(d), 416.927(d).  The ALJ must then determine how much weight to give to each opinion.  *Id.* Majeed's second legal issue questions whether the ALJ failed to provide good reasons and to properly evaluate opinion evidence from the consultative examiner and treating therapist.  (R. 10, PageID #: 1126.)  She contends that the ALJ erred with regard to the weight assigned to the various medical opinions contained in the record.  *Id.* at 1139-1141. These arguments fail, as set forth below.

Majeed first notes that the ALJ assigned great weight to the opinions of the reviewing psychologists, Vicki Warren, Ph.D., and James Lai, Psy.D., but that their opinions were not

based on the complete record, as Majeed did not begin counseling until after their opinions were rendered.  *Id.* at 1139.  Majeed argues that the treatments records provide further information on irritability and insomnia.  *Id.*  The Commissioner downplays this argument because Majeed's symptoms improved once she began counseling, and the reviewing consultants had thus actually found her to be more impaired than she was after counseling began.  (R. 12, PageID #: 1162, citing R. 9, PageID #: 959.)  In addition, the Commissioner contends that Majeed failed to identify any subsequent medical records that arguably may have changed the consultants' opinions.  *Id.* at 1162-1163.

It is noteworthy that, although the ALJ gave great weight to the opinions of the reviewing psychologists, he stated their opinions were based on a thorough review of "the available medical records." (R. 9, PageID #: 78.)  The ALJ thus implicitly recognized that the record had not been fully developed at the time that these opinions were formulated.  Any evaluation necessarily takes place at some finite point in a person's treatment history, and the ALJ recognized that.  Although the ALJ gave the consultants' opinions great weight, he did not adopt their entire opinions.  (R. 9, PageID #: 78.)  The ALJ properly explained the weight that he gave to the opinions of the reviewing psychologists.

Majeed also finds fault with the ALJ's assignment of limited weight to the consultative psychologist Dr. Wax's opinion, "because [the ALJ determined] it is not fully consistent with records indicating severe anxiety and insomnia, which interfere with the claimant's ability to concentrate and limit her to unskilled work."  (R. 10, PageID #: 1139-1140, quoting R. 9, PageID #: 78.)  Majeed asserts this is illogical, and interprets this to indicate that the ALJ believed a diagnosis of anxiety disorder was lacking.  *Id.* at 1140.

24

The ALJ's decision, however, cross-referenced October 2013 and August 2014 treatment notes from PA Stehouwer.  (R. 9, PageID #: 78, citing PageID #: 979, 987.)  During the October 31, 2013, visit, Majeed reported that she was severely depressed, and did not get out of bed most days.  (R. 9, PageID #: 987-988.)  But context is important, as Majeed confirmed that she was feeling well on her medications and her medications ran out five days earlier.  *Id.* at 988.  During an August 4, 2014 visit with PA Stehouwer, Majeed's subjective complaints included anxiety and depression, which were helped with Paxil.  She also reported severe insomnia, which was contributing to a poor ability to cope with normal life stressors.  *Id.* at 979.  The objective findings indicated her general appearance was alert, in no apparent distress and cooperative.

Dr. Wax, a state consultant, had a clinical interview with Majeed for a psychological evaluation.  (R. 9, PageID #: 495-500.)  Dr. Wax diagnosed Majeed with panic disorder, with agoraphobia, and major depression, but also stated she was able to maintain attention and concentration.  (R. 9, PageID #: 498-499.)  The ALJ assigned limited weight to this opinion because he determined it was not fully consistent with "records indicating severe anxiety and insomnia, which interfere with the claimant's ability to concentrate and limit her to unskilled work."  (R. 9, PageID #: 78, citing PageID #: 979, 987.)  Although Majeed claims that the ALJ was "playing doctor" and wanted to make his own diagnosis, there is no such assertion of an alternate diagnosis in the ALJ's discussion of Dr. Wax's evaluation.  *See generally* R. 9, PageID #: 78.  The ALJ gave a lesser weight to Dr. Wax's opinion because he indicated that the opinion did not fully reflect what the ALJ determined to be the full extent of Majeed's limitations.

Majeed also suggests that the ALJ is "required to give good reasons" for the weight he assigned to Dr. Wax's opinion.  (R. 10, PageID #: 1140.)  This is simply incorrect.  Although the

25

ALJ must evaluate all the medical opinions in the record, *Walton*, 1999 WL 506979, the opinion of a one-time examining psychologist is not entitled to any special deference.  *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).  The requirement that an ALJ give "good reasons" for rejecting the opinion of a treating physician does not apply to Dr. Wax, who was a one-time examining psychologist not a treating provider.  *Smith v. Commissioner*, 482 F.3d 873, 876 (6th Cir. 2007); *Kornecky v. Commissioner*, No. 04-2171, 2006 WL 305648, at *9-*10 (6th Cir. Feb. 9, 2006).  The ALJ satisfactorily explained the weight given to the opinion of the consulting psychologist Dr. Wax.

The ALJ, however according to Majeed, "failed to provide good reason for the weight assigned" to the medical source statement of therapist Ray-Novak.  (R. 10, PageID #: 1141.)  But Majeed also concedes that Ray-Novak is not an acceptable medical source (R. 10, PageID #: 1141).  Thus, as discussed above, the "good reasons" requirement does not apply.  In addition, as the ALJ explained, he assigned little weight to Ray-Novak's August 7, 2015 medical source statement, "because she is not an acceptable medical source and the severe limitations she indicates are not fully consistent with her own treating notes indicating that the claimant is feeling 'pretty good' with greatly improved mood and improved sleep."  (R. 9, PageID #: 78, citing PageID #: 959.)  The ALJ also indicated that Ray-Novak's limitations "are internally inconsistent with indications that the claimant has satisfactory ability to understand, remember, and carry out short and simple instructions, can sustain an ordinary routine without special supervision, and can ask questions and request assistance."  (R. 9, PageID #: 78, citing PageID #: 1119.)

Majeed further argues that the ALJ's determination—that her source statement was not consistent with her treating notes—assessed only one appointment when Majeed was doing better. *Id.* This is inaccurate. Although the ALJ did cite to the notes from a December 2014 appointment when Majeed was "feeling 'pretty good' with greatly improved mood and improved sleep," (R. 9, PageID #: 78, citing PageID #: 959), the ALJ's subsequent reference to "internal inconsistencies" cites to Ray-Novak's medical source statement of August 2015 (*id.*, citing PageID #: 1119), which covered a period beginning in June 2014. (R. 9, PageID #: 1117.) The ALJ satisfactorily explained the weight which was given to the opinion of Ray-Novak.

The ALJ's decision concerning the weight of the opinion evidence is supported by substantial evidence, as explained above.

### D. Alleged Procedural Error

Majeed's brief claims the ALJ committed a procedural error, contending: The ALJ was required to re-open her first application and his failure to do so was error. (R. 10, PageID #: 1141-1142.) Majeed states she filed a previous application using the same onset date, but it was denied on August 16, 2013. (R. 10, PageID #: 1141.) The ALJ noted her current application should be considered an implicit request to re-open, but determined that "pursuant to 20 CFR 416.1687 and 404.988, an unfavorable decision does not warrant the reopening of a closed case for review." (R. 9, PageID #: 70.)

Majeed counters that the cited regulations require re-opening for any reason if the new application was filed within twelve months of the initial determination in the prior application. (R. 10, PageID #: 1141-1142.) The Commissioner responds that this court does not have

27

jurisdiction to review the ALJ's decision concerning whether or not to reopen.  (R. 12, PageID #: 1168-1169.)  As the Commissioner notes, the Supreme Court ruled that the Social Security Act does not authorize judicial review of a refusal to reopen a claim for Social Security benefits, absent a constitutional challenge.  *Califano v. Sanders*, 430 U.S. 99, 107-108 (1977); *Blacha v. Secretary, HHS*, 927 F.2d 228, 231 (6th Cir. 1990).  Majeed has not raised a constitutional challenge.  This court, therefore, will not review whether the ALJ erred by not re-opening her previous application.

## VIII.    CONCLUSION

For the foregoing reasons, the court finds that the decision of the Commissioner is supported by substantial evidence.  The record evidence discussed in the ALJ's decision is such that "a reasonable mind might accept [it] as adequate" support for the Commissioner's final benefits determination.  *See Kirk*, 667 F.2d at 535 (quoting *Richardson*, 402 U.S. at 401).  Accordingly, the undersigned recommends that the decision of the Commissioner be **AFFIRMED**.

s/ David A. Ruiz
David A. Ruiz
United States Magistrate Judge

Date:  October 12, 2017

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of mailing of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See*

*Thomas v. Arn*, 474 U.S. 140 (1985); *see also United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).